Next case will be 075159, Atamirzayeva v. United States. Good morning, your honors. May it please the court, Wesley Heath on behalf of Mrs. Zoya Atamirzayeva. The issue before the court today is whether Mrs. Atamirzayeva can pursue a claim under the Takings Clause for the United States' expropriation of her property in Uzbekistan. The answer to that question is yes, for four reasons. First, there is no dispute that she has core Article III standing as someone aggrieved by government action. The court below found that the government does not dispute that. Second, when the court below said she didn't have standing, it was meant she was not within the protected zone of interest of the Takings Clause. There is no issue of standing separate from whether she may invoke the Takings Clause's protection. The government agrees that is the sole issue before the court today. Third, that question was answered in Terni. And fourth, Terni remains the law. The material facts in this case and in Terni are identical. Both cases involve a foreign, national, non-resident alien bringing a claim for just compensation for property located abroad. What should we make of the trustee's position in Terni as a U.S. citizen? The trustee in Terni was a United States citizen. However, as the court established... Was he the main party? Was he Terni? He was the main party. He was substituted for the corporation. However, at the time of the taking, the corporation was a Philippine corporation. I'm sorry, the party whose property was taken was a Philippine corporation as the court found in that case. Not only that... But who was the real party in interest then? Was it the corporation or was it Terni? The corporation was the real party in interest, and the owners of the corporation, who were the majority of them, were foreign nationals. What would you say the measure of damages should be in a case like this? For example, in Uzbek law, let's say that for a taking, all you get is the actual value of the real estate. You don't get the value of the commercial enterprise. Would she be entitled to the total just compensation in American terms or only in Uzbek terms? That is not an issue we have gotten to yet, Your Honor. To me, it matters because it... Well, let's see what your answer is. Maybe it won't matter. The taking clause is flexible in the kind of ways that it allows just compensation. There are a variety of factors that can go into it to determine what is appropriate under the circumstances. I think the clause will be flexible enough in this case to take account of a variety of factors, including Uzbek law on that issue. Is that to say that she would get only what she would have gotten from a court in Uzbekistan? I would think the United Takings Clause, the general formulas for compensation in this case, would apply under American law. So she would get full back under American law? I believe so, yes, Your Honor. What are the damages? Is there any indication in the records? No, Your Honor. We have had no discovery in this case. We submitted a replacement value for the cafeteria, which we thought was an amount that would be reasonable, that was produced to the government, but there has been no discovery allowed in this case, so we have not had the opportunity to probe that issue. So it must be more than $10,000. Yes, it is, Your Honor. Does she have recourse to the courts over there? She has attempted to get compensation from the Uzbek government. The Uzbek government refuses compensation because they have said the taking was at the direction and for the benefit of the United States, and therefore the duty of compensation is upon the United States, not upon the government of Uzbekistan. The Turney case was a high-profile case and an important precedent of the court of claims. On one side stood Warren Berger for the United States. On the other side, Thurman Arnold for the plaintiff. Judge Madden rendered a decision of all five judges and unanimously agreed on the issue of liability in that case. The basic principle in Turney was reaffirmed in the Trust Island cases, and it was cited with approval by the Supreme Court in Reed. If this court finds... But was it in a footnote in Reed? I believe that's correct, Your Honor. So was that approval? It was one of six cases that was cited in the footnote. It was cited as an example of a case in which the courts of the United States have found that the Constitution applies abroad. And what basis was Reed? Was it a Fifth Amendment taking at that point? No, Reed was a case dealing with the application of the right to trial by jury to United States citizens abroad. It was a Seventh Amendment issue, not a Fifth Amendment taking. Sixth. Sixth. Now, with respect to that, if the Supreme Court, in subsequent cases after Reed and some of the others, indicates that maybe the Constitution does not apply abroad as such for noncitizens or aliens, is that an indication that maybe we should take a look at the case before us on that basis? And apply some of their principles on substantial connections with the United States? There is no case from the Supreme Court finding that Taken's Clause does not apply to alien property overseas. The only case that deals with that issue is Turney. That's not a Supreme Court case. That is correct, Your Honor. The government relies on a very broad sentence in Verdugo regarding the application of the Fifth Amendment. That sentence is dicta. Verdugo is a case about the warrants clause of the Fourth Amendment, not the Fifth Amendment. That dicta goes beyond the limiting concurrence of Justice Kennedy, who rejected categorical rules regarding the application of the Constitution abroad. But Kennedy's opinion was not the majority opinion. That is correct, Your Honor. It was a concurring opinion. It is a concurring opinion. However, he does reject the categorical rules that is contained in the dicta the government cites. And because he provided the necessary fifth vote in that case, his limiting concurrence necessarily limits the broad sentence upon which the government relies. Justice Kennedy invoked Justice Harlan's concurrence in Reed to find there is no rigid and abstract rule governing the application of the Constitution abroad. He went on to state that the basic holding of Reed was the government may act only as the Constitution authorizes, whether the actions in question are foreign or domestic. He then applied that to a case involving a noncitizen abroad, stating the question then becomes what constitutional standards apply when the government acts in reference to an alien within a sphere of foreign operations. Those constitutional standards were decided by the court of claims attorney in regard to the takings clauses application to aliens abroad. And to the extent the government relies on the dictum regarding the application of the Fifth Amendment in Verdugo, that in itself rests on a reading of Eisentrager, which was subsequently called into question by the Supreme Court in its recent decision in Rousseau. As Justice Scalia stated in that case, today's decision overrules Eisentrager. And all of these cases upon which the government relies... In other words, one justice's opinion. That is true, Your Honor. In all the cases upon which the government relies, both Verdugo and Eisentrager, which is even earlier, this court has already considered this issue in El Shifa just four years ago. But going back to Verdugo, there is a statement in there, even in Kennedy's concurring opinion, saying, in effect, I have little doubt that the full protection of the Fourth Amendment would apply, but not in this case. In the absence of local judges or magistrates, does that imply that maybe we should be looking at some of the considerations of substantial connections with the US and whether or not the constitutional protections should be extended to the particular party, based upon substantial connections? I don't think so, Your Honor. I think what Justice Kennedy is clearly saying there, because he invokes Justice Harlan's concurrence in Reed, saying that the application of the takings clause in this situation would be both impractical and anomalous. And he then goes on a list of a large number of reasons, as Your Honor just stated, as to why the application of the warrants clause would be impractical and anomalous in this situation. In contrast, we have a case here in which it is not impractical and anomalous to apply the takings clause abroad, because the purpose of the clause is to provide just compensation, which can be made by writing a check. But what is the connection to the US under these circumstances? Are we saying that the United States acted to take the property? Yes, Your Honor. Was it not Uzbekistan's government that did the taking? Uzbekistan's government executed the taking as the agent of the United States. Where is that agency? There is no document in the record showing an agency between the governments, is there? There is not a document showing the agency, Your Honor, but the courts have recognized under the takings clause that there is no requirement of an actual signature of agency that the United States can take the property of a person, and it can actually transfer property between private citizens. The effect is the transfer of property between private citizens, even if there is not an actual execution of that. Is the property being presently used by the United States? It was being used as a guard post of the United States Embassy, Your Honor. Is it being used by the United States? A guard post outside of the compound of the embassy is not necessarily used by the United States. Security is provided by the national government, not the US. The Uzbek soldiers occupied the cafeteria as a guard post of the United States Embassy. However, the taking clause is very clear that... But that's not the United States that's on that property. The United States is not physically on the property, Your Honor. However, it is receiving the benefit of that property, and it did go to the Uzbek government and demanded that property be taken to provide security for the embassy, and the United States embassy personnel oversaw the destruction of the cafeteria. Does that make it a US taking? Yes, Your Honor. On what basis? The taking clause doesn't require that the United States physically occupy the property. It is enough that the United States deprives the owner of all benefit to the property. Is that an element that we can consider as part of the totality of the circumstances under the situation? No, Your Honor. The only issue before the court today is whether she has the right to pursue a taking action. That is, the question of whether the government of Uzbekistan is responsible for the... I'm sorry, the United States government is responsible for the taking by the Uzbek government... The question of agency, as I was saying, is a question which is decided on the facts, as this court found in Lagunayer. Well, we'll hear from the government. We'll give you a full rebuttal time-out. Thank you, Your Honor. Mr. Nelson? May it please the court, Ryan Nelson for the United States. This appeal raises a question of first impression for this court, namely, whether a foreign, non-resident alien can recover for property absent any contacts with the United States that is allegedly taken in a foreign country. Why doesn't Turney apply? Turney doesn't apply for a number of reasons. First of all, it was a U.S. plaintiff. Standing in the shoes of the Philippine corporation. That's not entirely clear, actually, Your Honor, because if you read Joint Appendix 37A, which is page 119 of the brief that was filed in Turney, it does state that it was a Philippine corporation, but it also goes on to state that under Philippine law, only U.S. shareholders could be members of that corporation. Well, the court itself said it was repossessed from the corporation in whose shoes the plaintiff stands. The corporation was a Philippine corporation. Well, that may be correct, but it was a Philippine corporation with solely U.S. shareholders, and under U.S. law, as we cited in our brief, once that corporation is dissolved, which it was just a few weeks after the alleged taking, the corporation no longer has any takings claim. The only parties in Turney that could have had a takings claim, and that did have a takings claim, were U.S. citizens. There was no foreign citizen that had any claim in Turney. In fact, that's exactly why the foreign citizens were interveners, because they had a separate, if you go back and read page 119 of the opinion, they had a separate contractual right with U.S. citizens. So the analogy in this case would be if the appellant here had a separate contractual right with a U.S. citizen for the operation of her cafe, that would be the analogy. There isn't a contract here. Who received the funds in Turney? Well, it is true that there were foreign nationals that had 70% of a derivative right to the profits, but they were not shareholders. In U.S. law, specifically... You didn't answer the question. Who received the benefits under Turney? Who received the money? Was it foreign citizens? Foreign citizens did receive some money, but not as shareholders, and that's an important distinction, because our brief specifically cites the cases where after a foreign corporation or any corporation is dissolved, only the shareholders have the taking right. So it is true that some of that money was passed through, but that was not under a Fifth Amendment takings claim. There is no basis for Turney to be read as applying to anything other than a U.S. citizen, and that's why the majority of courts that have addressed this issue have pointed out that fact specifically, that it was a U.S. citizen that was the plaintiff. She raises the issue that basically the U.S. was the one who requested the taking and supervised the taking. That's the allegation in the complaint, is it not? Correct. So we have to take that as a fact that's established in the motion to dismiss. Correct. Now, if that's the case, and the U.S. directed it for its needs and its purposes, why isn't it taken by the U.S. at that point? Well, I looked at the Porter case. The Porter case actually said two things. That's not at issue in this case. The United States, as you probably know, filed below a motion to dismiss on that grounds, withdrew that motion, I think under the premise that that would have required a bit of discovery to get to the bottom of. So we withdrew that motion and filed a motion under the current grounds, which is up on appeal now, which is that there is no claim, takings claim, by a foreign non-resident alien for property taken abroad. But the Porter case addresses that question and says there wasn't any basis in the Porter case because the taking was actually made by a foreign government. For the benefit of the U.S. I don't think that was necessarily an issue in Porter. There was not an issue in Porter, but in this particular case it was done for the benefit of the United States. Well, that may be. So if it was done for the benefit of the U.S., why wouldn't be a taking under the Fifth Amendment at that point where the United States is reaping the benefits of the taking? Because the United States did not take the specific action. I don't think that it's fair to say that any... No, we're not saying they took the specific action. We're saying that they are reaping the benefits of the taking's action. Well, that may be, but that would truly expand the Fifth Amendment if this Court were to take the position, again, not at issue in this case, but if this Court were to take the position that any act of a foreign government that benefits the United States, that the United States then has to compensate for that, I'm not sure this Court wants to go there because your docket would expand exponentially at that point. Considerably, I suspect. Well, it's not just benefit. It's acting at the behest of the United States at the outset, I think, is the claim, and we have to accept the pleadings. Because this was dismissed on the pleading, we have to accept the allegations as true. That's true, and again, I don't want to belabor the point because it's not... It's not in the case, I understand. But even that is, I mean, at the behest of... I don't think you want to let plaintiffs come in and argue what at the behest of is because you're going to have any low-level conversation. Let's go back to Turn, if we could, which obviously is an important element of this. You're arguing that Turney, if I understand your argument, does not really stand for the proposition that a non-resident alien has Fifth Amendment takings rights with respect to property outside the United States. That's absolutely correct. But don't we run into a problem with al-Shifa because that is, as I read our opinion on al-Shifa, exactly the way we characterized what Turney did hold and what it does stand for. I don't think so. I think al-Shifa... The fair reading of al-Shifa is... Let me read the sentence I have in mind so I have a text that we're looking at. Let's see. I've lost the particular passage. In any event, what the Court ultimately says at the end of that discussion is that the question of whether Verdugo overturns Turney isn't one that the Court needs to address, the implication being, as I read the opinion, that Turney, absent Verdugo, would be binding on the Court. Do you not read al-Shifa as saying that? I don't read al-Shifa as saying that. I read al-Shifa as summarizing the positions of the two parties. And admittedly, in al-Shifa, the parties pitched this as, hey, Turney is controlling here. That's not exactly correct. I don't think, and the United States does not believe that Turney needs to be overruled to decide this case. So your position is, with respect to al-Shifa, an option not taken but not foreclosed by anything in al-Shifa was to say Turney is not pertinent. They just chose to go another route? That would be my position. First of all, it is all dicta. There's no question about that in al-Shifa because they didn't reach the question. They summarized the two positions. And what the United States is now arguing is this Court does not need to overturn Turney. In fact, as you well know, you can't overturn Turney as a panel but for intervening Supreme Court precedent. Right, but that was the question the Court was addressing, whether Verdugo justified saying that Turney was no longer good law. I mean, obviously, if the Supreme Court had said, let's say, in Verdugo, you could argue about dictum holding, but if the Supreme Court had said, oh, by the way, among the various rights that a foreign national with respect to foreign activities does not have is right under the takings clause, presumably we wouldn't have hesitated very long before saying Turney is no longer good law. I think that's correct. The United States' position here is that Turney does not need to be overturned. There are no contacts here. There's no contract in Turney. There was a contract with the United States which has been held to meet substantial contacts. Here, there's nothing. There's absolutely no connection between the appellant in this case and the United States. This Court can and should distinguish Turney on that basis if this Court feels... Well, the second point is this Court needs to interpret Turney in light of subsequent Supreme Court case law. And there's no way that appellant's position in Turney can be adopted in light of Verdugo, Zadvides, and those cases go back to Eisentrager. And this Court in Daimler-Chrysler in 2004 said even if you consider Verdugo as dicta, this Court said we are bound by dicta from the Supreme Court in footnote three in the Daimler-Chrysler decision. Or at least we preceded apparel. You may do that and this case could get more interesting if that's how this Court wants to go. I guess we have followed Supreme Court footnotes in the past. Yes, and that's the better course of action. May I make another point? The appellants, I think, have missed a pretty key point of Verdugo. They're stating that Kennedy's concurrence provided the fifth vote. That's actually inaccurate. Kennedy joined the majority opinion. The majority opinion had five votes. He then went on and wrote a separate concurrence, but that separate concurrence in no way takes away from the majority opinion there. It merely adds to it as any other... But it might suggest that the majority opinion should be read more cautiously than one might otherwise read it, since one of the members who joined didn't take at least a sweeping view of the scope of the opinion. However cautiously you want to read Verdugo, appellants still has no claim there. There is no basis, there is no case that has ever held that a foreign national for property taken in a foreign country, absent some significant conduct, such as a contract, a U.S. plaintiff, a U.S. stockholders in a foreign corporation, all those factors in turning. Go back and read turning, it's one paragraph of analysis. You've looked at the briefs, I take it, attorney? Yeah. Was, I haven't, so was this case pitched to the court on the narrow ground that you're suggesting here, or was it pitched to the court on the broad question of whether the Fifth Amendment applies at all? Well, In other words, well, you understand the question. Yeah, the United States did argue in that case that the Fifth Amendment doesn't apply at all outside of the United States. Did the government also argue that given the specific, well, no, the specific facts would have been the argument made by the other side, I suppose, that the specific fact, did the other side argue that the specific facts of this case distinguished it, even if the government was right with respect to its broad argument? It didn't go into the depth. I think it's fair to say that 55 years ago when turning was decided, it was ably briefed, but this issue, as the district court noted, specifically was not before the court. And that's why our position is this is a case of first impression. The only courts to have decided this are this court in an unpublished opinion in 2001 in Hoffman. And while that's certainly not binding precedent, under Circuit Rule 32.1 this court is entirely within its right to read that decision and even cite it in its opinion as the district court did below. And this court found in 2001 that non-resident plaintiffs do not have a takings claim for property located abroad. And then there's three district court opinions that hold to the same effect. The CFC opinions, right? One CFC opinion, one Florida opinion, and then Hoffman in the district court. Oh, okay. So I think Hofstra is the only CFC opinion. Oh, all right. But those are good reasoning. They're well-reasoned, they're persuasive cases, and they take light of Verdugo. I mean, one of the key problems in turning is it doesn't even cite Eisentrager. I mean, you know, I just, I think, I think plaintiffs, I understand why the appellant is focusing on Turney because it's really the only read that they have. But it's a very thin read and it's very, it just can't bear the burden that they're trying to place on that case. Well, it's very shallow analysis in Turney as far as the Fifth Amendment is concerned. But I'm still troubled by the fact that you're saying that we can distinguish Turney completely on the basis of U.S. citizens being the recipients of the funds that would be paid over by the U.S. at that point in time and the shareholders were U.S. citizens and the trustee was certainly a U.S. citizen but he stood in the shoes of the Philippine Corporation. But the Philippine Corporation had been dissolved. If it hadn't been dissolved, then your analysis would be right. But once that was dissolved, under U.S. law, the only parties that have the right to pursue the rights of that corporation are the shareholders and every single U.S. shareholder was a U.S. citizen in that case. If this judge wants... Well, without the derivative aspect of the foreign individuals that also participated... But that in and of itself is a distinguishing factor. If this court, if you're not convinced by any of the other distinguishing factors I've given, look to the contract. There were two separate contracts between the corporation and the United States. If that's what this court wants to hinge as a distinguishing factor, I think that's a pretty compelling one as well. And again, if the appellant here had signed a contract with the United States, this case might be different. But she didn't have a contract with the United States. She had no contacts. There's simply no case that the appellant can point to, and Turney is not one of them, that goes as far as the appellants are trying to go with this. But that's a substantial connection theory then that you're arguing. Well, that is correct, but I don't think it's fair to read Turney the way the appellant argues either. This issue just wasn't really pitched that way. It wasn't decided by the court that way. And the best that you can do with Turney is look at it as a fact-specific determination. And it's true that the court didn't say this fact is the most important fact, or this fact is the most important fact, but it's very fact-intensive, and it does not, and it cannot stand for the broad proposition that appellants take here that every foreign national, appellants interpret would mean that there's basically no limit, because there are no enemy foreigners right now, and so basically any foreigner that ever has property taken would be able to sue the United States, and that just doesn't withstand the scrutiny of that case. My time's up, but if there's no further questions, the Court of Federal Claims decision should be affirmed. Thank you. Mr. Heath. Thank you, Your Honor. Two points. The government argues that essentially this would result in a tremendous number of cases before this Court. That's obviously not the case. Terny's been on the books for 50 years, and it has resulted in only a handful of cases. That is because in that case it requires that the United States direct the taking and the taking before the benefit of the United States. It also, as the Court recognized in El Shifa, the enemy property doctrine and political question doctrines are also applicable in many cases that may involve that. In Terny, it was obvious that it was a foreign corporation who was the claimant for the property. That's obvious from the opinion. It is obvious from Warnberger's briefs. It is obvious from Arnold's briefs. We've included those in the joint appendix. They go on in great length about this issue. It was accepted by this Court in El Shifa just four years ago that it was a foreign corporation. In Terny, the Attorney President stated that in the Terny case, the plaintiff was an alien corporation whereas the instant plaintiff is an American citizen. If that fact is material, it is to her advantage. Clearly, the claimant attorney was a foreign corporation. In El Shifa just four years ago, this Court found that an individual panel could not overrule Terny. It stated we cannot simply overrule Terny. You don't think that what the opposing counsel said about the shareholders matters in Terny? No, Your Honor. It is clear from the Terny decision that the claimant is the corporation. That was recognized by Judge Matt Inser a few years later. It was recognized in this Court by El Shifa. It was recognized in this Court by the parties. In that case, it was argued extensively. Clearly, the claimant attorney was the foreign corporation. At what point, again, was the corporation dissolved in the course of the proceedings? It was dissolved after the taking had taken place. The corporation filed the claim. There were some interveners. There was some discussion about that here. The interveners sought to get 100 percent of the value because of various contractual issues. That is why they were intervening in that case. As this Court found in El Shifa, it was accepted by this Court that the plaintiff was a foreign corporation. The government's argument also ignores that the Court found in El Shifa that the attorney was a foreign corporation. You do represent that the Court referred to this as a foreign corporation? A Philippine foreign corporation? The court did not require substantial connections with  States. The government argues it did. The court rejected that argument in El Shifa. I suppose in El Shifa the court did not require to bear down on the question of exactly what the scope of attorney was. Ultimately it did not. The government asked for an over ruling attorney there. This court said it is not for an individual panel to over rule attorney. The issue has already been decided by this court. Do you know whether the government made the narrower argument in El Shifa regarding attorney or did it simply ask for an over  ruling  there.